UNITED STATES IN THE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HENRY S. HARRISON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 2008-cv-288 |
| ) | |
| THE NATIONAL ASSOCIATION OF ) | Judge Darrah |
| REALTORS, THE REALTORS ) | |
| NATIONAL MARKETING INSTITUTE ) | Magistrate Judge Brown |
| OF THE NATIONAL ASSOCIATION OF ) | |
| REALTORS; and THE COUNCIL OF ) | |
| RESIDENTIAL SPECIALISTS, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |
| ) | |
| COUNCIL OF RESIDENTIAL ) | |
| SPECIALISTS, ) | |
| ) | |
| Counter-Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| HENRY S. HARRISON, ) | |
| ) | |
| Counter-Defendant. ) | |

**ANSWER OF COUNCIL OF RESIDENTIAL SPECIALISTS
TO PLAINTIFF'S FIRST AMENDED COMPLAINT
<u>FOR MONEY DUE AND COUNTERCLAIM</u>**

**<u>ANSWER</u>**

NOW COMES COUNCIL OF RESIDENTIAL SPECIALISTS ("CRS"), by its attorneys, Neil E. Holmen, James Keinzle and Walker Wilcox Matousek LLP, and for its Answer To Plaintiff's First Amended Complaint For Money Due states as follows:

{File: 00055040.DOC / 2}

## JURISDICTION AND VENUE

1. Plaintiff Henry S. Harrison is an established and successful writer who has authored numerous works. His residence and principal place of business is New Haven, Connecticut.

**ANSWER:** CRS admits the allegations of paragraph 1.

2. Defendant National Association of Realtors is a not-for-profit corporation, incorporated in the State of Illinois, having its principal place of business in Chicago, Illinois.

**ANSWER:** CRS admits the allegations of paragraph 2.

3. Defendant The Realtors National Marketing Institute of the National Association of Realtors is a not-for-profit corporation, incorporated in the State of Illinois on January 4, 1991 and dissolved involuntarily by the Illinois Secretary of State on June 1, 2002.

**ANSWER:** CRS admits the allegations of paragraph 3.

4. Defendant Council of Residential Specialists is a not-for-profit corporation incorporated in the State of Illinois on November 13, 2001.

**ANSWER:** CRS admits the allegations of paragraph 4.

5. The matter in controversy exceeds, exclusive of interest and costs, the sums specified by 28 U.S.C. § 1332.

**ANSWER:** CRS admits the allegations of paragraph 5.

## BACKGROUND & FACTS

6. Defendant National Association of Realtors through its Realtors National Marketing Institute and other divisions publishes various books and publications.

**ANSWER:** CRS admits that the National Association of Realtors publishes books and other publications. CRS denies that any books or other publications are published by the National Association of Realtors through the Realtors National Marketing Institute as that entity has not existed since 2002. CRS lacks knowledge to admit or deny that any books and other publications are published by the National Association of Realtors through any other division.

7. In approximately 1973, the parties entered into their first agreement for the publication of Mr. Harrison's work entitled Houses, the Illustrated Guide to Construction,

-2-

<u>Designs and Systems</u> (hereinafter referred to as the "Work"). Throughout the 1970s and early 1980s, several editions printing and reprinting the Work were undertaken pursuant to the contracts in place at the time.

　　**ANSWER**:　CRS admits the allegations of paragraph 7.

　　8.　Unfortunately, the Defendants did not pay royalties due to Mr. Harrison and as a result, in approximately 1984 after lengthy negotiations, a settlement was entered into by and between the parties in which the Defendant paid to Mr. Harrison delinquent and unpaid royalties.

　　**ANSWER**:　CRS denies that CRS was not paying royalties to Harrison in the early 1980s. CRS admits only that in the early 1980s CRS provided Harrison with a revised accounting which CRS believes resolved any and all questions regarding royalties.

　　9.　In 1991, the parties entered into a new agreement (a copy of which is attached hereto and incorporated herein as Exhibit 1, and referred to as the "Agreement"), dated May 1, 1991 for the continued publication by the Defendant of the Work. The agreement was between Mr. Harrison and the "Realtors National Marketing Institute of the National Association of Realtors". It was signed by "Nina J. Cottrell, Executive Vice-President, RESIDENTIAL SALES COUNCIL of the REALTORS NATIONAL MARKETING INSTITUTE."

　　**ANSWER**:　CRS admits that on May 1, 1991, its predecessor in interest, REALTORS NATIONAL MARKETING INSTITUTE of the NATIONAL ASSOCIATION OF REALTORS ("RNMI"), entered into a Publication Agreement with Henry S. Harrison, a copy of which is attached to the complaint as Exhibit 1 and which was signed by Nina Cottrell as Executive Vice-President of Residential Sales Council of the Realtors National Marketing Institute. Answering further, CRS states that the terms of the Agreement speak for themselves.

　　10.　As a result of the prior nonpayment and/or underpayment of royalties by the Association and/or Institute, the Parties specifically agreed to a substantial interest payment in the event of any other delinquencies, lateness, arrears or nonpayment by the Association and/or Institute. Specifically, Paragraph 9(f) of the Agreement calls for a royalty of five percent (5%) monthly late fees on balances due until they are paid in full.

　　**ANSWER**:　CRS states that the terms of the Agreement speaks for themselves and denies any allegation not consistent with the stated terms of the Agreement.

{File: 00055040.DOC / 2}

11.  Unfortunately, once again, the Association and/or Institute was derelict in its royalty obligations and another settlement agreement was entered into which covered the underpayment and nonpayment of royalties through 1999.

**ANSWER:** CRS denies the allegations of paragraph 11.

### **BREACH OF THE AGREEMENT**

12.  In 1999, Mr. Harrison authored an updated version of the Third Edition of the Work.

**ANSWER:** CRS admits the allegations of paragraph 12.

13.  In approximately December 1997, the Institute entered into an agreement with Dearborn Financial Publishing, Inc., a Kaplan Professional Company, as Publisher's licensee or agent who was engaged for the purpose of sale, distribution or manufacture of the Work. (A copy of the cover title pages of the Kaplan Edition of the Work are attached hereto as Exhibit 2.)

**ANSWER:** CRS admits that RNMI and Dearborn Financial Publishing, Inc. entered into an agreement which bears the date December 9, 1997 and which was signed by the parties on February 27, 1998 and March 10, 1998, respectively, by which Dearborn would act as "PUBLISHERS" licensee or agent engaged for the purpose of sale, distribution or manufacture of the Work" as that phrase is used in Paragraph 9(b) of the Agreement.

14.  Under the terms of the Agreement in Section 9(b), Mr. Harrison was to receive a royalty of the fifteen percent (15%) of the net proceeds actually received by the Publisher, or received by the Publisher's licensing agent engaged for the purpose of sale, distribution and manufacturing of the Work less returns.

**ANSWER:** CRS denies the allegations of paragraph 14 and states that the terms of the Agreement speak for themselves and specifically denies that plaintiff has accurately set forth the terms of the Agreement in paragraph 14.

15.  The Agreement additionally provides for a royalty of fifty percent (50%) of the next receipts received by the publisher on sale or license to any third party or any subsidiary rights in the Work.

**ANSWER:** CRS states that the terms of the Agreement speak for themselves and specifically denies that plaintiff has accurately set forth the term of paragraph 9(c) of the Agreement in paragraph 15.

16. Under the specific language of the Agreement, Mr. Harrison was to receive fifteen percent (15%) of either the sums received by the Publisher (Institute) if it was actually publishing the work, or fifteen percent (15%) of the proceeds received by the Publisher's licensee (in this case Dearborn Financial Publishing, Inc.) if the Publisher delegated its obligations to a licensee or an agent engaged for purposes of sale, distribution and/or manufacture of the Work.

**ANSWER:** CRS states that the terms of the Agreement speak for themselves and specifically denies that plaintiff has accurately set forth the terms of the Agreement in paragraph 16.

17. The agreement entered into by and between the Institute and Dearborn Financial Publishing, Inc. (a copy of which is attached hereto as Exhibit 3) is an agreement covered by Section 9(b) of the Agreement which required Mr. Harrison to be paid fifteen percent (15%) of the license/agent's receipts.

**ANSWER:** CRS admits that the agreement entered into by and between the Institute and Dearborn (Exhibit 3) is an agreement covered by Section 9(b) of the Agreement but specifically denies that plaintiff has accurately set forth the terms of Section 9(b) of the Agreement in paragraph 17.

18. As such, Mr. Harrison is entitled to fifteen percent (15%) of the revenues received by Dearborn Financial Publishing, Inc. from the sale of the Work.

**ANSWER:** CRS denies the allegations of paragraph 18.

19. Based on information and belief, Dearborn Financial Publishing, Inc. has been paying the Association, Institute and/or the Council the sums called for under their separate agreement. However, Mr. Harrison has not been receiving his fifteen percent (15%) of the amounts received by Dearborn Financial Publishing, Inc. based on its role as publisher, licensee or agent as provided for in the Agreement.

**ANSWER:** CRS admits that it has received certain sums from Dearborn pursuant to the agreement between RNMI and Dearborn but denies the remaining allegations of paragraph 19.

20. Additionally, the Association, Institute and/or the Council has been selling copies of the Work as well which are not covered by the Dearborn Financial Publishing, Inc.'s agreement but for which Mr. Harrison is to be compensated. Mr. Harrison has not been paid his fifteen (15%) royalties on those sales either.

**ANSWER:** CRS denies the allegations of paragraph 20.

21. Mrs. Harrison has not received the interest due him for the late and nonpayment of royalties as he is entitled to under the Agreement.

**ANSWER:** CRS denies the allegations of paragraph 21.

22. Mr. Harrison has made repeated demands individually and through counsel upon the Association and/or Institute for the payment of the sums due him to no avail. Mr. Harrison did not know the Council existed until after this action was filed.

**ANSWER:** CRS admits that plaintiff has made various demands for payment of sums. CRS denies that plaintiff is due any money and has no knowledge regarding plaintiff's knowledge, or lack thereof, regarding CRS.

23. Based on information and belief of the sums received by Dearborn Financial Publishing, Inc. and the late fees called for in the Agreement have resulted in Defendant being indebted to Mr. Harrison for a sum in excess of $275,000.00, plus accruing interest, costs and attorneys fee.

**ANSWER:** CRS denies the allegations of paragraph 23.

24. Based on information and belief, the Institute was involuntarily dissolved in 2002.

**ANSWER:** CRS admits that RNMI was dissolved in 2002.

25. Based on information and belief, the Institute transferred the Agreement to the Council.

**ANSWER:** CRS admits that it is the successor in interest to all of RNMI's rights, duties and obligations under the Agreement.

26.     The transfer occurred without the knowledge and consent of Mr. Harrison. The transfer materially violated the terms of the Agreement, specifically the limitations on assignment set out in paragraph 16 of the Agreement, thereby voiding the agreement.

**ANSWER:**    CRS denies the allegations of paragraph 26.

27.     At all times and in regard to all transaction, the Association was the principal actor, motivating force, and beneficiary.

**ANSWER:**    CRS denies the allegations of paragraph 27.

WHEREFORE, COUNCIL OF RESIDENTIAL SPECIALISTS respectfully requests the Court to enter judgment in its favor and against plaintiff Henry Harrison, that it be awarded its costs sustained herein and for such further relief as the Court deems just and proper.

## COUNTERCLAIM

Defendant/Counter-Plaintiff COUNCIL OF RESIDENTIAL SPECIALISTS ("CRS"), by its attorneys, Neil E. Holmen, James W. Kienzle and Walker Wilcox Matousek LLP, for its counterclaim against Plaintiff/Counter-Defendant HENRY S. HARRISON ("HARRISON"), states as follows:

1.     Counter-Plaintiff CRS is an Illinois not-for-profit corporation with its principal place of business in Chicago, Illinois.

2.     Counter-Defendant HARRISON is a citizen of the State of Connecticut. HARRISON has submitted himself to the personal jurisdiction of this Court by filing the instant action against CRS.

## JURISDICTION AND VENUE

3.     This counterclaim is brought pursuant to Rule 13(a) of the Federal Rules of Civil Procedure.

4.     This Court has diversity jurisdiction over this matter under 28 U.S.C. § 1332.

5.     Venue is proper in this judicial district under 28 U.S.C. § 1391(a).

6. On May 1, 1991, REALTORS NATIONAL MARKETING INSTITUTE of the NATIONAL ASSOCIATION OF REALTORS ("RNMI") entered into a Publication Agreement ("Agreement") with HARRISON whereby RNMI agreed to publish a Work entitled "Houses" in accordance with the provisions of the Agreement, including the payment of royalties under certain conditions.

7. On or about January 1, 2002, RNMI was dissolved. CRS is the successor in interest to all of RNMI's rights, duties and obligations under the Agreement and the Agreement was assigned to CRS as authorized by the express language of paragraph 16 of the Agreement.

8. Pursuant to its obligations to pay royalties to HARRISON, CRS has since 1991 made numerous royalty payments by check to HARRISON.

9. On approximately April 23, 2003 CRS sent one of the royalty payments referred to in Paragraph 8 above to HARRISON. HARRISON sometime in 2004 informed CRS that check had been lost or not received.

10. CRS issued a replacement check for the royalties owed to HARRISON and delivered the replacement check to HARRISON.

11. Thereafter HARRISON negotiated both the original check and the replacement check resulting in an overpayment of the royalties owed by CRS to HARRISON.

12. In 1999 and 2000 HARRISON place orders with CRS to purchase copies of the Work. These orders totaled 240 copies of the Work.

13. HARRISON did not pay CRS for the copies of the Work purchased from CRS, but pursuant to an understanding with CRS the cost of these copies was offset against the royalties earned by HARRISON on direct sales of the Work by CRS.

14. Upon investigating and reconciling HARRISON's claims that he had not been paid all royalties due him, CRS discovered that indeed all royalties due and owing through 2005 had been paid and also discovered that HARRISON had cashed both checks sent by CRS as described in Paragraph 11 above, there was a resulting overpayment to HARRISON in the amount of $2,592.75 which is due and owing to CRS.

15. During its investigation, CRS also discovered that there remained an outstanding balance due and owing to CRS for copies of the Work ordered by and supplied to HARRISON by CRS as described in Paragraphs 12 and 13 above. After application of all royalties earned by HARRISON for direct sales of the Work by CRS against the sum due for copies of the Work provided to HARRISON as described in Paragraph 13 above, there remains due to CRS the amount of $1243.44.

15. Based on the overpayment of royalties to HARRISON in the amount of $2592.75, the outstanding balance owed to CRS by HARRISON for copies of the Work supplied to him of $1243.44 and the CRS's estimate of accrued royalties due to but not yet paid to HARRISON in an amount less than $1,500, HARRISON owes CRS an amount in excess of $2,000.

16. HARRISON has been advised that he owes CRS a sum in excess of $2,000 but to date, HARRISON has refused to acknowledge that he owes any amount to CRS.

WHEREFORE, CRS requests the Court to enter judgment in its favor and against HARRISON in an amount in excess of $2,000, the exact amount to be determined prior to the trial of this matter, and for such other and further relief as the Court deems just and proper.

Respectfully submitted,

THE COUNCIL OF RESIDENTIAL SPECIALISTS


By:  /s/ Neil E. Holmen
      One of its Attorneys


Neil E. Holmen
James W. Kienzle
WALKER WILCOX MATOUSEK LLP
225 West Washington Street, Suite 2400
Chicago, IL  60606
Phone:  (312) 244-6700

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of March, 2008, I did cause a true and correct copy of the foregoing **Answer of Council of Residential Specialists to Plaintiff's First Amended Complaint For Money Due And Counterclaim** to be served upon the following parties:

Daniel A. Cummings
Rothschild, Barry & Myers LLP
55 West Monroe Street
Suite 3900
Chicago, IL  60603
**Via Electronic Mail – EM/ECF system
(cummings@rbmchicago.com)**

Joshua J. Kaufman
Venable LLP
575 7th Street, N.W.
Washington, D.C.  2004
**Via U.S. Mail**

　　　　　　　　　　　　　　　　　　　　　　　／s／ Neil E. Holmen
　　　　　　　　　　　　　　　　　　　　　　　Neil E. Holmen

{File: 00055040.DOC / 2}