UNITED STATES IN THE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HENRY S. HARRISON,  )<br>    Plaintiff,  )<br>)<br>v.  )<br>)<br>THE NATIONAL ASSOCIATION  )<br>OF REALTORS, THE REALTORS  )<br>NATIONAL MARKETING  )<br>INSTITUTE OF THE NATIONAL  )<br>ASSOCIATION OF REALTORS;  )<br>And THE COUNCIL OF  )<br>RESIDENTIAL SPECIALISTS,  )<br>    Defendants.  )<br>_____)<br>)<br>COUNCIL OF RESIDENTIAL  )<br>SPECIALISTS,  )<br>    Counter-Plaintiff,  )<br>)<br>v.  )<br>)<br>HENRY S. HARRISON  )<br>    Counter-Defendant.  ) | Case No.: 2008-cv-288<br><br>Judge:  Darrah<br><br>Magistrate Judge: Brown |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO THE DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS
AND PLAINTIFF'S MOTION AND MEMORANDUM IN SUPPORT
FOR SUMMARY JUDGMENT**

Plaintiff Henry S. Harrison ("Mr. Harrison") responds in opposition to Defendant The Council Of Residential Specialists ("The CRS")'s Motion for Judgment on the Pleadings. In combination with that response, pursuant to Rule 56 of the Federal Rules of Civil Procedure, Mr. Harrison submits this memorandum in support of his Motion for Summary Judgment.

BACKGROUND

Mr. Harrison is a successful and accomplished author having over 14 published books to his credit. In 1973, Mr. Harrison contracted with Realtors National Marketing Institute ("RNMI"), an affiliate of the National Association of Realtors, to publish the first edition of

1

*Houses, the Illustrated Guide to Construction, design and System* ("*Houses*"). The book was published and was successful; over 300,000 copies were sold. (*See* promotional material attached hereto as Exhibit A). Unfortunately, disputes arose regarding the nonpayment and underpayment by RNMI of royalties to Mr. Harrison. A settlement was reached and the parties decided to publish a second edition of *Houses*. A contract was entered between Mr. Harrison and RNMI in 1991 ("1991 Agreement") for the publication by RNMI of a second edition of *Houses*. (*See* Agreement at Dkt. 1, Ex 1 and also at Dkt. 23, Ex. 1). Defendants have represented that Council of Residential Specialists ("CRS") is the successor in interest to all of RNMI's rights, duties and obligations under the Agreement and any other contracts at issue in this matter. (Answer ¶ 24).

In 1991, RNMI and Dearborn Financial Publishing, Inc.'s division, Real Estate Education Company ("Dearborn"), co-published the Second Edition of *Houses*. (*See* cover and inside pages of the second edition of *Houses* attached hereto as Exhibit B (CRS0217-218); *see also* correspondence of counsel attached hereto as Exhibit C; *see also* correspondence from Dearborn to Mr. Harrison demonstrating their involvement with editing and publishing attached hereto as Exhibit D). On or about December, 1997, RNMI entered into either an illegal assignment or an agency/licensing publication agreement with Dearborn ("1997 Dearborn Agreement") to publish a Third Edition of the Work. (Attached hereto as Exhibit E (CRS0009-14); also at Dkt. 23, Ex. 2). The terms of the 1997 Dearborn Agreement may have modified the 1991 RNMI and Dearborn relationship, but that is not clear as no copy of the original agreement between RNMI and Dearborn has been produced.

At that time, the 1991 Agreement was still in effect and governed the publication of *Houses*. There were no revisions to the 1991 Agreement, nor was Mr. Harrison consulted as to the 1997 Dearborn Agreement. At some point in time (an audit will reveal when) after the

2

1991 Agreement was signed, RNMI or its successor Defendant CRS began to pay Mr. Harrison 15% of the funds that it received from Dearborn (which amounted to a royalty to Mr. Harrison of as low as less then 1%), rather than 15% of its agent/licensee Dearborn's receipts as called for in the 1991 Agreement. Negotiations ensued to correct this underpayment but were not successful and as a result of the failed negotiation, this suit was initiated.

## INTRODUCTION

Mr. Harrison agrees that this matter can be resolved at this juncture with the Court's interpretation of the contract language in the 1991 Agreement and therefore in combination with his response in opposition to the motion for judgment on the pleadings, Mr. Harrison seeks summary judgment in his favor.

While the parties seek the Court's interpretation of the contract, in reality, under either the Mr. Harrison's or the Defendant CRS's interpretation, Defendants' have breached the 1991 Agreement and Mr. Harrison is entitled to damages as a matter of law.

## LEGAL STANDARD

A.  <u>Motion for Judgment on the Pleadings:</u>

"A defendant may use a *rule 12(c)* motion after the close of the pleadings to raise various *rule 12(b)* defenses regarding procedural defects, in which case courts apply the same standard applicable to the corresponding 12(b) motion." *Alexander v. City of Chicago*, 994 F.2d 333, 336 (7th Cir. 1993)(internal citations removed; emphasis in original).[1]  However,

---

[1] That standard is: "Facts alleged in the complaint are viewed in the light most favorable to the non-moving party, and judgment may not be granted unless it appears beyond a doubt that the non-moving party cannot provide facts that would support his claim." *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 500 F.Supp.2d 864, 867 (ND Ill 2007). "Resolution of the case pursuant to Rule 12(c) is appropriate only if it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief. Additionally, the complaint should merely narrate a claim: Having specified the wrong done to him, a plaintiff may substitute one legal theory for another without altering the complaint.... A complaint may not be dismissed unless it is impossible to prevail under any set of facts that could be proved consistent with the allegations." *Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000)(internal citations removed).

3

where the defendant uses 12(c) to attempt to "dispose of the case on the basis of the underlying substantive merits … the appropriate standard is that applicable to summary judgment, except that the court may consider only the contents of the pleadings." *Id.*

Here, Defendant CRS argues that it is entitled to judgment as a matter of law based on the underlying substantive merits, specifically the interpretation of the language in the contract at issue. Therefore, the appropriate standard is that applicable to summary judgment. Furthermore, because materials outside the pleadings are relevant to this analysis, summary judgment itself is the more appropriate motion.

      B.      Summary Judgment

Summary judgment is appropriate when the submissions "show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986). "The inquiry performed is the threshold inquiry of determining whether there is a need for trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. Ill. 2007).

Once the movant has demonstrated the absence of any genuine issues of material fact, the burden shifts to the nonmoving party to show that summary judgment should not be granted. *Celotex*, 477 U.S. at 325. The party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The non-moving party cannot merely rely on its pleadings, mere allegations or general denials or even theoretical or metaphysical doubts about the moving party's evidence. *Anderson,* 477 U.S. at 256-57 (the

4

mere existence of a "scintilla of evidence" is insufficient to defeat a motion for summary judgment); *see also Matsushita*, 475 U.S. at 586. "In considering a motion for summary judgment, the district court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies." *Hemsworth*, 476 F.3d at 490 citing *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003).

  C. Contract Interpretation

Contract interpretation is a matter of law and it is proper for the Court to resolve a contract interpretation dispute on summary judgment. *See Rubin v. Laser*, 301 Ill. App. 3d 60, 68 (1st Dist. 1998).

"It is well settled that a court, when construing a contract, should ascertain the intent of the parties and give effect to that intent." *Clarendon America Ins. Co. v. 69 West Washington Management LLC,* 374 Ill.App.3d 580, 585 (1 Dist. 2007). In fact, this is the Court's primary objective. *American States Ins. Co. v. Koloms*, 177 Ill.2d 473, 479 (1997).

"Illinois follows the four corners rule for contract interpretation, in that, an agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." *Id.* "If, however, the trial court finds that the language of the contract is susceptible to more than one meaning, then an ambiguity is present." *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 462 (1999).

Where two clauses are inconsistent and conflicting, "it is the duty of the court to determine which of the two clauses most clearly expresses the chief object and purpose of the contract" *Harris Trust & Sav. Bank v. Hirsch*, 112 Ill. App. 3d 895, 900 (1st Dist. 1983).

Conflicting clauses must be construed so as to give effect to the intention of the parties as collected from the whole instrument, and apparently conflicting provisions should be reconciled, if possible.  *Id.; Lehman v. U. S.*, 139 F.Supp. 10 (ND Ill. 1956).

## ARGUMENT

Under either Mr. Harrison's or Defendant CRS's interpretation of paragraph 9(b) of the 1991 Agreement, Defendants have breached the 1991 Agreement and Mr. Harrison is entitled to damages as a matter of law.

Mr. Harrison suggests that a plain reading of paragraph 9(b) of the 1991 Agreement makes Defendants obligated to pay him a 15% royalty from the sales of the book *whether the book was sold by Publisher or the Publisher's agent*.  By failing to pay Mr. Harrison the required 15%, Defendants have breached the 1991 Agreement.

Defendant CRS suggests a reading of paragraph of 9(b) that permitted Defendants to assign their rights and obligations to Dearborn such that Mr. Harrison's royalty has been decreased from an industry standard of 15% to as little as less then 1% (only .75% - 2.25%; CRS receives 5% - 15% from Dearborn depending on the method of sale).  If that is indeed the case, then under the 1991 Agreement, Defendants have breached and infringed upon the rights given and warranties made to Mr. Harrison in violation of paragraph 16 of the 1991 Agreement.

A. <u>Reading paragraph 9(b) in the context of the entire agreement and the intent of the parties demonstrates that Defendants breached the contract by not paying Mr. Harrison the required 15%</u>

Paragraph 9(b) on the Contract provides, in its entirety:

> (b) A royalty of fifteen percent (15%) of the net proceeds actually received by the PUBLISHER in respect of (i) all sales by PUBLISHER (or PUBLISHER'S licensee or agent engaged for the purpose of sale, distribution or manufacture of the Work), less returns, of the regular edition of the Work in the United States and (ii) the exercise of other rights granted to the PUBLISHER pursuant to this Agreement, except as hereinafter provided.

6

Dkt. 23, Ex. 1.

The key language in paragraph 9(b) is that Mr. Harrison is entitled to receive "A royalty of fifteen percent (15%) of the net proceeds actually received by the PUBLISHER in respect of (i) all sales by PUBLISHER *(or PUBLISHER'S licensee or agent engaged for the purpose of sale, distribution or manufacture of the Work)."*

Defendant CRS contends that "net proceeds actually received by the publisher" means that if the publisher only receives 5% from a sale then Mr. Harrison in turn only receives 15% of that 5%. That reading, however, is not reasonable in light of the intent of the parties, the full sentence and the entire 1991 Agreement, and would result in great damage to the Mr. Harrison.

Defendants agreed to pay Mr. Harrison a royalty of 15% of sales in exchange for a publication agreement. The 1991 Agreement provides that Defendants may "authorize an agent or licensee of PUBLISHER to sell, distribute or manufacture the Work" (paragraphs 5 and 16 mention this allowance) but does not provide *anywhere* that Mr. Harrison's royalties would decrease in such an instance.

In interpreting a contract, it has been found that "the parentheses must be deemed to be mere surplusage" and the parentheses were to be stripped from the contract, otherwise the contract did not express the parties' intention. *Meyer-Kiser Bank Liquidating Committee v. Byrum*, 210 Ind. 11, 199 N.E. 255, 257 (Ind. 1936). That is apposite here because in this instance there is no difference between Publisher or their surrogate. With the parentheses removed, it becomes even clearer that the 15% applies to Publishers or their surrogate's receipts.

> 1. <u>The parties' intent was clear that Mr. Harrison should receive a royalty of 15%.</u>

As the *Clarendon America Ins.Co.* case held, it is important to ascertain the intent of the parties. *Supra,* 374 Ill.App.3d at 585. Here, the intent of the parties is known and documented. Mr. Harrison's intent has been clear from the outset of the parties negotiation of the 1991 Agreement and is documented. Based on their response to discovery, it appears that the Defendant cannot recall the circumstances surrounding the negotiation of this contract. (*See* June 13, 2008 e-mail from Defendant's counsel Mr. Holmen attached hereto as Exhibit F; *see also* Defendant CRS's Responses to Interrogatories attached hereto as Exhibit G).

During the negotiation of the 1991 Agreement, Mr. Harrison was vehement that he not receive less than 15% of gross revenues from the sale of his book or that under any circumstances would his percentage be diluted. Mr. Harrison was presented with a draft agreement (attached hereto as Exhibit H (CRS0327-03329)) to which he responded with a letter dated March 27, 1991 (attached hereto as Exhibit I (CRS0289-0291). In that letter he addressed the principal issue in this cause of action, Section 9(b) of the 1991 Agreement. He specifically sought protection against dilution of his royalty rate, exactly the type of conduct undertaken by Defendants which is now at issue. (Ex. I at CRS0290). He points out for purposes of illustration a few examples of dilution undertaken by the Defendants in the past. (Ex. I at CRS0290-10, ¶(h)). What is clear from his letter is Mr. Harrison's clear intent that he sought to ensure that they will not be any future dilution of his royalty rate. *Inter alia*, he sought to limit their ability to give away rights to his books, to include as

course material or otherwise dilute his interests, and set the floor for what he would receive for each book ($2) for excessive books given away (Ex. I at CRS0290, ¶(b)).

Additionally, in the early draft of the 1991 Agreement presented by Defendants to Mr. Harrison, CRS sought to pay him a 5% royalty for publication of the book in foreign countries. (Ex. H, Section (9)(c) at CRS0329). In his response to the proposed draft agreement, Mr. Harrison specifically rejects any royalty rate lower then 15% (Ex. I, CRS 0290, ¶(b)). The proposed lower rate was removed from the final contract and Mr. Harrison was to be paid the 15% standard on publications in foreign countries as well.

It is important to note that in the right-hand margin of the attached copy of the March 27, 1991 letter produced by Defendant CRS, there is the annotation *"OK"* acknowledging agreement to Mr. Harrison's conditions which was placed there by the Defendants whereby they agreed to Mr. Harrison's demands (CRS0290) regarding Section 9 (*see* sections 9 (j) and (k)).

The March 27, 1991 letter could not be clearer in demonstrating Mr. Harrison's intent and the clear agreement by Defendants that his royalty rate of 15% of gross sale revenues was not to be lowered or diluted.

Previously, Mr. Harrison had various problems with the Defendants in regard to their nonpayment of royalties due him and for inappropriate royalties paid to him. He attempted to address these matters in this agreement even to the point of having a very significant interest rate penalty assessed against the Defendants for late payments as an incentive to keep them on track. (*See* Ex. I, at CRS0290, ¶(h) and section 9(f) of the 1991 Agreement replacing section 9(h) of the draft contract at Dkt. 1, Ex 1 and also at Dkt. 23, Ex. 1).

2. <u>Dearborn was a "publisher" when the 1991 agreement was signed.</u>

Additionally, the participation of Dearborn was already in place in 1991 when Mr. Harrison was receiving his full 15%. They were already assisting in the editorial and marketing of the book, dealt directly with Mr. Harrison (Ex. D) are considered co-publisher by RNMI (Ex. C) and are listed as co-publishers (Ex. B). In this context, the parties understood Dearborn was an active participant, a co-publisher and Mr. Harrison was offered a full 15% royalty of Publisher or their agent's revenues (RNMI *and* Dearborn). It is not as if Dearborn came into the picture late and changed the relationship between the parties. Of course, Mr. Harrison understood that the term Publisher in 9(b) would equally encompass Dearborn as well as RNMI no matter what their respective roles were. (*See* Affidavit of Henry Harrison attached hereto as Exhibit J, ¶7). Therefore, when Mr. Harrison signed the 1991 Agreement, he was confident he would receive his full 15% regardless of what tasks Dearborn and RNMI divided between themselves or their exact contractual/business relationship. (*Id.*) As co-publishers, either Dearborn or CRS were to pay Mr. Harrison his full 15% of the revenues they received.

Mr. Harrison understood that if the Defendants worked out an agency agreement, they would negotiate a situation where the gross receipts of them would exceed the 15% that they were obligated to pay him. For example they would negotiate a deal with a 20% royalty for which they would received 5% and pay the author his 15%. In such a scenario it makes perfectly good sense that CRS would receive a lesser royalty as they were doing less work, specifically, they were assigning the bulk of their obligations to the subagent/licensee. Mr. Harrison, on the

other hand, had fully performed his obligations in that he wrote the book. There is no basis for him to receive a reduced and nearly non-existent royalty.

### 3. The terms must be construed against Defendants.

Finally, Defendants, with the assistance of counsel, drafted the agreement. (*See* May 16, 1991 correspondence indicating counsel reviewed the 1991 Agreement, attached hereto as Exhibit K (CRS 0287)). Mr. Harrison was without counsel during the negotiations. It is black letter law and accepted by this circuit that when terms are susceptible to more than one meaning, they will be "construed strictly" against the drafter. *See American States Ins. Co.*, *supra,* 177 Ill.2d at 479; *see also* 12 A Ill. Law and Prac. Contracts § 240, Construction against Party Preparing Contract. As such, if there is a question as to interpretation of the contract terms, they must be construed in Mr. Harrison's favor against the drafting Defendants.

### B. Defendant CRS's interpretation would produce an absurd result.

As Defendant CRS points out, "Courts will construe a contract reasonably to avoid absurd results." *Foxfield Realty, Inc. v. Kubala*, 287 Ill.App.3d 519, 523 (2 Dist.1997). In construing the contract, "the court must ascertain the intent of the parties as evidenced in the contract as a whole, and not merely by reference to particular words or isolated phrases." *Id.* "Finally, to the extent that a contract is susceptible of two interpretations, one of which makes it fair, customary, and such as prudent persons would naturally execute, while the other makes it inequitable, unusual, or such as reasonable persons would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred." *Id*.

Defendant CRS claims that Mr. Harrison's interpretation would yield an absurd result because Defendants would be forced to pay Mr. Harrison more than they receive from

11

Dearborn. This argument is not well taken. Defendants negotiated the agreement with Dearborn and were the entity in the position to avoid the apparently difficult result that they are now faced with. Mr. Harrison, on the other hand, was not consulted during the Dearborn negotiations and had no way to avoid this problem. (Ex. J, ¶9). What is absurd is for an author who has fully performed his obligations to then have his royalty drop from 15% to less the 1% based on his publisher's negotiation of a contract without reflection on the consequences on its prior obligation. What would appear to have happened, quite simply, is that Defendants negotiated a contract with Dearborn without considering its previous obligations to Mr. Harrison.

Furthermore, Defendants do not necessarily have to lose money under their current 1997 Dearborn Agreement, as they allege. Attached to the 1997 Dearborn Agreement is the "Distribution Agreement" pursuant to which Defendants may purchase copies of *Houses* at a greatly reduced rate. (Ex. E, at CRS0014). Defendants may purchase *Houses* at a special discount of 48% off trade list price, and turn around and sell these copies at a large profit. (*Id.*) While Defendants complain that they would be losing money on one part of the 1997 Dearborn Agreement if they had to pay Mr. Harrison a 15% royalty, they could in turn make significant profit on another part of the 1997 Dearborn Agreement pursuant to the "Distribution Agreement."

In the *Foxfield* case, plaintiff real estate agent sought 6% commission when seller husband received his wife's share of the property as part of a divorce settlement pursuant to a quitclaim of her interest. The *Foxfield* court found that plaintiff's interpretation was inconceivable because "[n]o reasonable person would enter into a sales contract in which he subjected himself to an unnecessary and unearned commission for the sale of property to himself or to his spouse under the circumstances presented." *Id.* at 525. Similarly, here, no

reasonable author would enter an agreement for 15% commission where that commission could be cut indiscriminately by the publisher to nothing or next to nothing at any time for any reason. If Defendant's logic is followed, Defendants could agree, for marketing or unrelated corporate objectives, to accept no remuneration at all from its licensee or agent and have the author receive nothing from the sale of the Work. That is an absurd result.

C. <u>By entering into the 1997 Dearborn agreement, Defendants violated the terms of the 1991 agreement.</u>

Subsection 9(i) of the 1991 Agreement states, "Rights to the Work as a whole can not be given away by the PUBLISHER without the permission of and negotiable compensation to the AUTHOR." (Dkt. 1, Ex 1 and also at Dkt. 23, Ex. 1)[2]. This appears to be exactly what Defendants did in the 1997 Dearborn Agreement (Ex. E). In the 1997 Dearborn Agreement, Defendants gave to Dearborn all of their then-existing rights, specifically to publish the then-current edition and all new and revised future versions of *Houses*. (*See* Ex. E, Section 4. Grant of Rights and Section 11. New or Revised Editions). They further agreed not to print, publish or furnish any competing book. (Ex. E, Section 12. Competing Works).

By giving away their rights to all current and future editions and agreeing not to compete with the Dearborn book(s) (i.e. continue to publish the past editions of the Work or anything similar) they clearly violated the restriction on giving the "Rights to the Work as a whole" without Mr. Harrison's permission or compensation to him. Mr. Harrison never gave permission to Defendants to give away the rights. (*See* Ex. J, ¶9). Perversely, instead of receiving additional compensation for the right to give away the rights as contemplated by the parties, Mr. Harrison has been penalized by having his royalty drop from a royalty of 15% to less then 1%.

---

[2] Dearborn agrees with this interpretation that Defendants' ability to transfer rights to Dearborn are clearly limited and would require Mr. Harrison's consent. (*See* correspondence from Dearborn to Defendants, attached hereto as Exhibit L (CRS0002)).

13

D.  Reading paragraph 9(b) as Defendants suggest would breach paragraph 16 of the contract

If Dearborn is not a Section 9(b) "Publisher's licensee or agent engaged for the purpose of sale, distribution or manufacture of the Work" then the 1997 Dearborn Agreement would be categorized as an assignment, and Defendants are in further violation of the agreement. Paragraph 16 of the Contract provides, in its entirety:

> Assignment: This Agreement shall inure to the benefit of, and shall be binding upon, the heirs, executors, or administrators and assigns of the AUTHOR and any successor in business of the PUBLISHER, but either party reserves the right to separately sell or assign its rights under this Agreement, *providing such sale or assignment shall not breach or infringe upon the rights given or warranties made to the other party hereunder*. Neither party may assign any of its obligations hereunder without the written consent of the other party, except that (i) PUBLISHER may assign or transfer its rights and obligations hereunder to any affiliated corporation or successor to substantially all of its business, and (ii) PUBLISHER may, pursuant to paragraph 5 hereof, authorize an agent or licensee of PUBLISHER to sell, distribute or manufacture the Work. (Note: The reference to paragraph 5 is clearly a typo and should be paragraph 9).

(Dkt. 1, Ex. 1; Dkt. 23, Ex. 1, emphasis added).

If the Court does not find a violation of section 9(i) and finds that paragraph 9(b) must be interpreted the way that Defendant CRS's proposes, then Mr. Harrison's rights have still been breached under the 1991 Agreement. By entering an agreement with Dearborn where Mr. Harrison would receive only a small fraction of the royalty the parties had previously negotiated, Defendants have breached or infringed on Mr. Harrison's rights to receive his 15% of the gross publisher/agent revenues directly injuring Mr. Harrison and have breached paragraph 16 of the 1991 Agreement.

## CONCLUSION

Under either Mr. Harrison's or Defendant CRS's interpretation of the contract, Defendants' have breached the 1991 Agreement. Either Defendants have breached paragraph 9(b) by failing to pay Mr. Harrison the 15% royalty to which he is entitled or they

14

have breached paragraph 9(i) and 16 by entering an agreement without Mr. Harrison's permission and detriment whereby Mr. Harrison's royalty rights have been diminished from 15% to as low as .75% in direct violation of his contractual rights. In all instances, Mr. Harrison has been injured by Defendants actions.

Wherefore Plaintiff respectfully requests that the Court:

(1) Find Defendants liable for breach of contract and order that Mr. Harrison be allowed a complete audit at Defendants' expense;

(2) Order Defendant CRS to pay to Mr. Harrison as damages an amount equal to the difference in sums he actually received and the 15% royalty due him based on Defendants' and Dearborn's respective receipts from the sale of *Houses* as called for in the contract, and further

(3) Order Defendant CRS to pay interest, expenses, costs and attorney fees as provided for in the 1991 Agreement.

Respectfully Submitted,

June 18, 2008          _____/s/_____
Joshua J. Kaufman
VENABLE LLP
575 7th Street, NW
Washington, DC  20004-1601
202-344-8538 (phone)
202-344-8300 (fax)
jjkaufman@venable.com

Daniel Cummings
Rothschild, Barry & Myers, LLP
55 West Monroe St., Ste 3900
Chicago, IL 60603
312-372-2345 (phone)
cummings@rbmchicago.com

*Counsel for Plaintiff Henry S. Harrison*

15

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 18, 2008, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

> Neil E. Holmen
> James W. Kienzle
> Walker Wilcox Matousek LLP
> 225 W. Washington St., Ste. 2400
> Chicago, IL 60606
> 312-244-6700 (phone)
> nholmen@wwmlawyers.com
> jkienzle@wwmlawyers.com
>
> *Counsel for Defendants The Realtors National Marketing Institute Of The National Association Of Realtors And The Council Of Residential Specialists*

> _____/s/_____
> Joshua J. Kaufman
> VENABLE LLP
> 575 7th Street, NW
> Washington, DC  20004-1601
> 202-344-8538 (phone)
> 202-344-8300 (fax)
> jjkaufman@venable.com
>
> Daniel Cummings
> Rothschild, Barry & Myers, LLP
> 55 West Monroe St., Ste 3900
> Chicago, IL 60603
> 312-372-2345 (phone)
> cummings@rbmchicago.com
>
> *Counsel for Plaintiff Henry S. Harrison*