UNITED STATES IN THE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HENRY S. HARRISON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 2008-cv-288 |
| ) | |
| THE NATIONAL ASSOCIATION OF ) | Judge Darrah |
| REALTORS, THE REALTORS ) | |
| NATIONAL MARKETING INSTITUTE ) | Magistrate Judge Brown |
| OF THE NATIONAL ASSOCIATION OF ) | |
| REALTORS; and THE COUNCIL OF ) | |
| RESIDENTIAL SPECIALISTS, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| COUNCIL OF RESIDENTIAL ) | |
| SPECIALISTS, ) | |
| ) | |
| Counter-Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| HENRY S. HARRISON, ) | |
| ) | |
| Counter-Defendant. ) | |

**COUNCIL OF RESIDENTIAL SPECIALISTS' REPLY BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

NOW COMES COUNCIL OF RESIDENTIAL SPECIALISTS ("CRS"), by its attorneys, Neil E. Holmen, James W. Kienzle and Walker Wilcox Matousek LLP, and for its Reply Brief in Support of its Motion for Partial Judgment on the Pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure states as follows:

**I.     Introduction**

As detailed in CRS's Motion for Partial Judgment on the Pleadings (Document 23), Plaintiff's Complaint alleges a garden variety cause of action for breach of a contract between

Plaintiff and CRS. The contract allegedly breached is an agreement (Exhibit 1 to the Complaint and to Doc. 23, "Agreement") for the publication of Plaintiff's work entitled <u>Houses, the Illustrated Guide to Construction, Designs and System</u> ("Work"). In 1997, CRS's predecessor in interest entered into a separate agreement with Dearborn Financial Publishing, Inc. (Exhibit 3 to the Complaint and Exhibit 2 to Doc. 23, "Dearborn Agreement") under which Dearborn was engaged for the purpose of the sale, distribution and manufacture of the Work, as that phrase is used in Section 9(b) of the Agreement. Section 9(b) details the payment of royalties from the sale or license of the Work. The principal dispute in this lawsuit is the parties' conflicting interpretations of Section 9(b) of the Agreement. Once this issue is resolved, the amounts owed under the Agreement will be a matter of calculation and accounting that can be accomplished by the parties.

## II.     The Parties Agree that the Court's Interpretation of Section 9(b) of the Agreement Is Ripe for Judgment on the Pleadings

While the parties disagree as to the meaning of Section 9(b) of the Agreement, they do agree on the law applicable to the Court's interpretation of the contract language. More specifically, as Plaintiff sets forth in his response brief, Illinois follows the four corners rule for contract interpretation. Plaintiff's Res. at 5 (citing <u>Air Safety, Inc. v. Teachers Realty Corp.</u>, 185 Ill.2d 457, 462 (1999)). Under the four corners rule, the contract "speaks for itself, and the intention with which it was executed must be determined from the language used. <u>It is not to be changed by extrinsic evidence</u>." Plaintiff's Res. at 5 (citing <u>Air Safety, Inc.</u>, 185 Ill.2d at 462) (Our emphasis). Extrinsic evidence should also not be considered if, as is the case here[1], the contract at issue contains an integration clause. <u>Air Safety Inc.</u>, 185 Ill.2d at 464. <u>See also,</u>

---

[1] The Agreement's integration clause provides as follows: <u>Entire Agreement</u>  This Agreement contains the whole understanding of the parties, supersedes all previous oral or written representations or agreements, and may not be changed, modified, or discharged orally. Any modification, change or discharge of this Agreement must be in writing and signed by a duly authorized officer of the PUBLISHER.

2

Clarendon America Ins. Co. v. 69 West Washington Management LLC, 374 Ill.App.3d 580, 590, 870 N.E.2d 978 (1st Dist. 2007). In addition, as Plaintiff correctly notes, contract interpretation is a matter of law. Plaintiff's Res. at 5 (citing Rubin v. Laser, 301 Ill.App.3d 60, 68 (1st Dist. 1998). Notwithstanding Plaintiff's understanding of and agreement with these basic principles of law concerning contract interpretation, Plaintiff's argument is laced with statements of his intent which he supports by references to extrinsic evidence such as the negotiations of the contract (Plaintiff's Res. at 8), a letter dated March 27, 1991 (Plaintiff's Res. at 8), earlier drafts of the Agreement (Plaintiff's Res. at 8), previous problems regarding payment of royalties under a previous agreement (Plaintiff's Res. at 9), his relationship with Dearborn (Plaintiff's Res. at 9) and his personal "understanding" of the Agreement (Plaintiff's Res. at 10), as well as Exhibits B, C, D, F, G, H, I and J. None of this matters. The principal issue in this lawsuit may and should be decided by the Court's interpretation of the operative provision of the Agreement without the use of extrinsic evidence. This issue is therefore ripe for judgment on the pleadings.

### III. Plaintiff Has Incorrectly Interpreted Section 9(b) of the Agreement

The heart of the dispute in this lawsuit is the amount payable to Plaintiff under Section 9(b) of the Agreement for sales made by Dearborn as CRS's licensee. Section 9(b) provides as follows:

9. <u>Royalties</u> PUBLISHER shall pay to, or upon the order of, the AUTHOR royalties from the proceeds received from the sale or license of the Work (other than sales made pursuant to paragraph 10 hereof), as follows:

*\*\*\**

(b) A royalty of fifteen percent (15%) of the net proceeds actually received by the PUBLISHER in respect of (i) all sales by PUBLISHER (or PUBLISHER'S licensee or agent engaged for the purpose of sale, distribution or manufacture of the Work), less returns, of the regular edition of the Work in the United States and (ii) the exercise of other rights granted to the PUBLISHER pursuant to this Agreement, except as hereinafter provided.

Plaintiff argues that, based on this language, he is entitled to fifteen percent (15%) of the gross revenues from the sale of each and every copy of his book regardless of whether the book was sold by CRS or by Dearborn. Plaintiff's Res. at 8. In support of his argument, Plaintiff cites an Indiana opinion for the proposition that parentheses are surplusage and must be stripped from a contract. Plaintiff's Res. at 7. According to Plaintiff, the key language in Section 9(b) is that CRS shall pay Plaintiff "[a] royalty of fifteen percent (15%) of the net proceeds actually received by the PUBLISHER in respect of (i) all sales by PUBLISHER *(or PUBLISHER'S licensee or agent engaged for the purpose of sale, distribution or manufacture of the Work)*, less returns, of the regular edition of the Work in the United States." Plaintiff argues that if you strip the parentheses from this language, there is no difference between CRS and Dearborn.

Put simply, Plaintiff's reading of Section 9(b) is inconsistent with the plain text of the Agreement and Plaintiff's argument also fails for other reasons. Unlike the Indiana court relied upon by Plaintiff, Illinois courts have interpreted parenthetical phrases without holding that they are surplusage. See, e.g., Lotus Grain & Coal Co. v. Zimmer, 217 Ill.App. 591, 1920 WL 1094, at *1-*2 (Ill. App. Ct. April 1920) (holding that the parenthetical expression 'at our option' modifies and limits the words 'on or before'); Rietz v. Siebold, 92 Ill.App. 147, 1899 WL 4533, at *2 (Ill. App. Ct. Oct. 1899). Also, the Northern District has more recently interpreted a parenthetical phrase, holding that "[t]he parenthetical is not surplusage; the parties added it to be cautious and to clarify" that certain claims would not be extinguished. Abbott Laboratories v. CVS Pharmacy, Inc., No. 01 C 2772, 2001 WL 1298712, at *5 (N.D. Ill. Oct. 24, 2001).

However, regardless of whether the parentheses at issue are surplusage, the language within the parentheses modifies the word "PUBLISHER" in Subsection (i), and not "PUBLISHER" as it appears previously in Section 9(b). The term "PUBLISHER" as defined by

4

the Agreement means "REALTORS NATIONAL MARKETING INSTITUTE of the NATIONAL ASSOCIATION OF REALTORS, a non-for-profit corporation of the State of Illinois".[2] The term "PUBLISHER" appears in the Agreement approximately one hundred times. The words of the parenthetical at issue - *(or PUBLISHER'S licensee or agent engaged for the purpose of sale, distribution or manufacture of the Work)* – are used in association with the term "PUBLISHER" only three times in the entire Agreement - in Section 9(b)(i), and in Sections 5 and 16. This limited placement of that statement regarding a licensee or agent of the PUBLISHER thus can only be understood to indicate that it applies only to those uses of "PUBLISHER" to which it is adjacent, and not to each and every use of the word PUBLISHER. Sections 5 and 16 permit PUBLISHER to authorize an agent or licensee to sell, distribute or manufacture the Work (Section 5) without the written consent of Plaintiff (Section 16), which is exactly what the Dearborn Agreement accomplishes. This supports the limited application of the reference to only particular uses of the word "PUBLISHER" and also demonstrates that Plaintiff's argument at Section C. of its Response (p. 13) that CRS breached the Agreement by giving away the work without permission of the author is wrong. The specific modification of the term "PUBLISHER" in one portion of the contract does not expand the definition throughout the entire contract. Therefore, under the plain meaning of the Agreement, Dearborn does not fall within the Agreement's definition of "PUBLISHER".

Moreover, the location of the parenthetical within Section 9(b) cuts against Plaintiff's argument. Because the parenthetical follows, and therefore applies to, only the use of the word PUBLISHER in subsection 9(b)(i) but not also PUBLISHER as it appears earlier in Section 9(b), the language of Section 9(b) clearly provides that Plaintiff is entitled to fifteen percent (15%) of the "net proceeds actually received" **by PUBLISHER (that is, CRS)** irrespective of whether the

---

[2] As set for in CRS's Motion, CRS is the successor of interest of the Realtors National Marketing Institute.

sales are made by CRS or a "licensee or agent engaged by CRS for the purpose of sale, distribution or manufacture of the Work." Nonetheless, Plaintiff reads Section 9(b) as if it was rearranged as follows:

9. <u>Royalties</u> PUBLISHER shall pay to, or upon the order of, the AUTHOR royalties from the proceeds received from the sale or license of the Work (other than sales made pursuant to paragraph 10 hereof), as follows:

    ***
    (b)  A royalty of fifteen percent (15%) of the net proceeds actually received by the PUBLISHER **<u>(or PUBLISHER'S licensee or agent engaged for the purpose of sale, distribution or manufacture of the Work)</u>** in respect of (i) all sales, less returns, of the regular edition of the Work in the United States and (ii) the exercise of other rights granted to the PUBLISHER pursuant to this Agreement, except as hereinafter provided.

Unfortunately for Plaintiff, the parenthetical does not appear in the location as shown in bold. It appears only after the use of the word "PUBLISHER" in subsection "(i)" which means that the Royalty due plaintiff as Author is fifteen percent (15%) of the net proceeds actually received by PUBLISHER only, not fifteen percent (15%) of proceeds received by others contracted to assist in sales, distribution and manufacture of the Work. Plaintiff cannot be allowed to read additional terms into unambiguous contract language or move language within the contract for his own benefit. Section 9(b) clearly provides that Plaintiff is entitled to fifteen percent (15%) of the "net proceeds actually received" **<u>by CRS only</u>**, not by CRS and/or Dearborn.

    **IV.    Plaintiff's Interpretation of the Agreement Creates Absurd Results**

The parties agree that, under established Illinois law, courts should construe a contract reasonably to avoid absurd results. Plaintiff's Res. at 11 (citing <u>Foxfield Realty, Inc. v. Kubala</u>, 287 Ill.App.3d 519, 523 (2 Dist. 1997). Thus, to the extent that a contract is susceptible of two interpretations, one of which makes it fair, customary, and such as prudent persons would naturally execute, while the other makes it inequitable, unusual, or such as reasonable persons

6

would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred. <u>Foxfield Realty, Inc. v. Kubala</u>, 287 Ill.App.3d 519, 524, 678 N.E.2d 1060, 1063 (2d Dist. 1997). <u>See also, Kokinis v. Kotrich</u>, 74 Ill.App.3d 224, 229, 392 N.E.2d 697, 701 (1st Dist. 1979).

Plaintiff argues that CRS's interpretation of the Agreement leads to absurd results. More specifically, Plaintiff argues that it is absurd that his royalty rate drops from fifteen percent (15%) to less than one percent (1%) for sales made by Dearborn under the Dearborn Agreement. What Plaintiff fails to recognize is that without the Dearborn Agreement, the sales made by Dearborn <u>would never have been made.</u> Plaintiff would have received nothing rather than fifteen percent (15%) of the net proceeds actually received by CRS from sales by Dearborn. While Plaintiff receives less for sales made by Dearborn, it is because CRS is receiving proportionately less from sales by Dearborn and Plaintiff still receives money he would not otherwise receive but for sales by Dearborn.

Thus, under the literal interpretation of the contract, Plaintiff receives: (1) fifteen percent (15%) of the "net proceeds actually received" from a sale made directly by CRS; and, (2) fifteen percent (15%) of a lower level of "net proceeds actually received" by CRS for sales made by Dearborn. Under the literal interpretation, both CRS and Plaintiff make money on the sale of every copy of the Work whether sold directly or sold under the Dearborn Agreement. This interpretation of the Agreement is fair and reasonable as everybody involved profits from every sale of a copy of the Work.

Under Plaintiff's interpretation of the Agreement, Plaintiff receives fifteen percent (15%) of the gross revenues from the sale of each and every copy of his book regardless of whether the book was sold by CRS or by Dearborn. However, under this interpretation, CRS would be

7

required to pay Plaintiff more than it actually received from Dearborn for the sale of the majority of copies of the Work under the Dearborn Agreement. While this interpretation benefits Plaintiff, it is clearly inequitable and creates illogical, ridiculous and absurd results with respect to CRS. No prudent person would enter into a contract that by definition causes that person to lose money.

In sum, while Plaintiff's interpretation of Section 9(b) conflicts with the express language used in the Agreement and leads to absurd results, the literal interpretation of the Agreement is clearly reasonable, rational and comprehensible. Under established Illinois law, CRS's interpretation should therefore be preferred by the Court.

## CONCLUSION

For the foregoing reasons, Defendant Council of Residential Specialists respectfully requests that this Honorable Court enter judgment in its favor on the pleadings with respect the meaning of Section 9(b) of the Agreement.

July 2, 2008                                     Respectfully submitted,

                                                 COUNCIL OF RESIDENTIAL SPECIALISTS

                                                 By: /s/ James W. Kienzle
                                                      One of its Attorneys


Neil E. Holmen
James W. Kienzle
WALKER WILCOX MATOUSEK LLP
225 West Washington Street
Suite 2400
Chicago, IL  60606
Phone:  (312) 244-6700
Facsimile:  312-244-6800

8

## CERTIFICATE OF SERVICE

 I hereby certify that on this 2nd day of July, 2008, I did cause a true and correct copy of the foregoing **Council of Residential Specialists' Reply Brief in Support of its Motion for Partial Judgment on the Pleadings** to be electronically filed with the Clerk of the Northern District of Illinois, Eastern Division, using the ECF, and served upon the following parties:

 Daniel A. Cummings
 Rothschild, Barry & Myers LLP
 55 West Monroe Street
 Suite 3900
 Chicago, IL  60603
 **Via Electronic Mail – EM/ECF system**
 (**cummings@rbmchicago.com**)

 Joshua J. Kaufman
 Venable LLP
 575 7th Street, N.W.
 Washington, D.C.  2004
 **Via U.S. Mail**

         /s/ James W. Kienzle
        Attorney for Council of Residential Specialists
        Walker Wilcox Matousek LLP
        225 West Washington Street
        Suite 2400
        Chicago, IL 60606
        Telephone:  312-244-6700
        Facsimile:  312-244-6800