MHN

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HENRY S. HARRISON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 08 C 288 |
| v. ) | |
| ) | Judge John W. Darrah |
| THE NATIONAL ASSOCIATION OF ) | |
| REALTORS, THE REALTORS ) | |
| NATIONAL MARKETING INSTITUTE ) | |
| OF THE NATIONAL ASSOCIATION ) | |
| OF REALTORS, and THE COUNCIL OF ) | |
| RESIDENTIAL SPECIALISTS, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Henry Harrison, brought suit against Defendants, the National Association of Realtors ("NAR"), the Realtors National Marketing Institute of the National Association of Realtors ("RNMI") and the Council of Residential Specialists ("CRS"), alleging breach of contract due to failure to pay royalties. CRS filed a Counterclaim, seeking to recover overpayment of royalties to Harrison. Both Harrison and CRS have moved for summary judgment on Harrison's Complaint.

## BACKGROUND

Harrison is an established and successful writer who has over fourteen published books to his credit. (Pl.'s 56.1(a), at ¶¶ 1, 9; Defs.' 56.1(a), at ¶ 1) He resides in New Haven, Connecticut. (Pl.'s 56.1(a), at ¶ 2.) Defendant NAR is a not-for-profit corporation incorporated in the State of Illinois, having its principal place of business in Chicago, Illinois.[1] (Pl.'s 56.1(a),

---

[1]NAR was dismissed from this suit on April 1, 2008.

at ¶ 3.) Defendant RNMI, an affiliate of NAR, is a not-for-profit corporation incorporated in the State of Illinois on January 4, 1991, and dissolved involuntarily by the Illinois Secretary of State on June 1, 2002. (Pl.'s 56.1(a), at ¶¶ 4, 10; Defs.' 56.1(a), at ¶ 6.) Defendant CRS is a not-for-profit corporation incorporated in the State of Illinois on November 13, 2001. (Pl.'s 56.1(a), at ¶ 5.) CRS is the successor in interest to all of RNMI's rights, duties and obligations under all contracts at issue in this matter. (Pl.'s 56.1(a), at ¶ 25; Defs.' 56.1(a), at ¶ 7.)

In 1973, Harrison contracted with RNMI (the "1973 Agreement") to publish the first edition of *Houses, the Illustrated Guide to Construction, Design and System* ("*Houses*"). The First Edition of *Houses* was published successfully with over 300,000 copies sold. (Pl.'s 56.1(a), at ¶ 11.) RNMI did not pay or underpaid royalties to Harrison under the 1973 Agreement, but the parties were able to reach several settlements resolving those issues. (Pl.'s 56.1(a), at ¶¶ 13, 14.)

In 1991, RNMI requested Harrison enter into a new contract with RNMI for the publication of the Second Edition of *Houses* (the "1991 Agreement"). (Pl.'s 56.1(a), at ¶ 15; Defs.' 56.1(a), at ¶ 3.) RNMI presented Harrison with a draft contract prepared by RNMI, which was based on a form agreement they had previously used, and negotiations ensued. (Pl.'s 56.1(a), at ¶ 16.) While negotiating the 1991 Agreement, Harrison did not have the benefit of an attorney, while RNMI was represented by an attorney. (Pl.'s 56.1(a), at ¶ 23.) As a result of the prior problem collecting royalties due to him, Harrison added a term that should RNMI fail to make the required payments pursuant to the 1991 Agreement, it would be subject to a five percent per month interest payment penalty. (Pl.'s 56.1(a), at ¶ 22.) RNMI accepted this term as part of the 1991 Agreement. (Pl.'s 56.1(a), at ¶ 22.)

On February 20, 1991, prior to entering into the 1991 Agreement, RNMI entered into an agreement (the "1991 Dearborn Agreement") with a division of Dearborn Financial Publishing, Inc. ("Dearborn"). (Pl.'s 56.1(a), at ¶ 26.) Under the 1991 Dearborn Agreement, Dearborn was to publish, sell and manufacture the Second Edition of *Houses*. (Pl.'s 56.1(a), at ¶ 27.) On December 9, 1997, RNMI entered into another agreement with Dearborn (the "1997 Dearborn Agreement") to publish a Third Edition of *Houses*. (Pl.'s 56.1(a), at ¶ 30.)

## LEGAL STANDARD

Summary judgment is appropriate when there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (*Celotex*). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986) (*Anderson*); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (*Matsushita*); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994). Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for

summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-250.

Contract interpretation is a matter of law, and it is proper for a court to resolve a dispute regarding contract interpretation on summary judgment. *Rubin v. Laser*, 301 Ill.App.3d 60, 68 (1st Dist. 1998). "It is well settled that a court, when construing a contract, should ascertain the intent of the parties and give effect to that intent." *Clarendon America Ins. Co. v. 69 West Washington Management LLC*, 374 Ill.App.3d 580, 585 (1st Dist. 2007) (*Clarendon*). "Illinois follows the four corners rule for contract interpretation, in that, an agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." *Clarendon*, 374 Ill.App.3d at 585 (internal quotations and citations omitted). In applying the four corners rule, a court initially looks to the language of a contract alone. *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 462 (1999) (*Air Safety*). If the contract is not susceptible to more than one meaning, the court interprets the contract as a matter of law without consideration of extrinsic evidence. *Air Safety*, 185 Ill.2d at 462. However, if more than one meaning is possible, the court may consider extrinsic evidence in resolving the ambiguity. *Air Safety*, 185 Ill.2d at 462-63.

"[W]here parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence." *Air Safety*, 185 Ill.2d at 464. However, even when a contract is integrated on its face, extrinsic evidence may still be used to explain the terms of an ambiguous contract. *See Lewitton v. ITA Software, Inc.*, 2008 WL 4427512 at *6 (N.D. Ill. 2008) (citing *Sunstream Jet Exp., Inc. v. International Air Service Co., Ltd.*, 734 F.2d 1258, 1266 (7th Cir. 1984)).

## ANALYSIS

The parties' dispute centers on the meaning of paragraph 9(b) of the 1991 Agreement. Paragraph 9(b) provides that Harrison is entitled to:

> "A royalty of fifteen percent (15%) of the net proceeds actually received by the PUBLISHER in respect of (i) all sales by PUBLISHER (or PUBLISHER'S licensee or agent engaged for the purpose of sale, distribution or manufacture of the Work), less returns of the regular edition of the Work in the United States and (ii) the exercise of other rights granted to the PUBLISHER pursuant to this Agreement, except hereinafter provided."

The parties agree that under paragraph 9(b), if CRS directly sells a copy of *Houses*, Harrison is entitled to fifteen percent of the net proceeds from that sale. However, the parties dispute the amount to which Harrison is entitled for sales made by Dearborn, acting as CRS's licensee or agent. Harrison argues that, in such a case, he is entitled to fifteen percent of the net proceeds actually received by Dearborn since it is Dearborn that is acting as the publisher. CRS argues that Harrison is entitled only to fifteen percent of the net proceeds actually received by CRS. As Harrison points out, because CRS receives only a small percentage of the revenues received by Dearborn from its sales of *Houses*, under CSR's interpretation of paragraph 9(b), Harrison receives far less in royalties for copies of *Houses* sold by Dearborn than he does for

5

copies sold directly by CSR. Harrison claims that his royalty rate on copies sold by Dearborn could be as low as 0.75 percent.

The first question that must be answered in resolving this dispute is whether the terms of the 1991 Agreement are ambiguous. "A contract term is ambiguous if it can reasonably be interpreted in more than one way due to the indefiniteness of the language or due to it having a double or multiple meaning." *William Blair and Co., LLC v. FI Liquidation Corp.*, 358 Ill.App.3d 324, 334 (1st Dist. 2005). Here, both parties assert that a plain reading of the text supports their interpretation of the 1991 Agreement.

The parties disagree on the meaning of the phrase "actually received by the PUBLISHER." CRS argues that this phrase indicates that the parties intended that Harrison should receive fifteen percent of the net proceeds received by CRS, whether these proceeds came from CRS's sales of *Houses* or payments to CRS from its agent's sales of *Houses*. Harrison argues that the phrase "actually received by the PUBLISHER" is meant to acknowledge that there are times when revenue is not actually received because of bad debt, returns or late payments. Both sides present a plausible reading. Were this passage omitted, paragraph 9(b) would read: "A royalty of fifteen percent (15%) of the net proceeds in respect of (i) all sales by PUBLISHER (or PUBLISHER'S licensee or agent . . .)." Under this language, Harrison would be entitled to fifteen percent of the net proceeds from sales of CRS or CRS's agent. From a review of the text alone, it cannot be said whether the phrase "actually received by the PUBLISHER" was inserted, as CRS claims, to limit Harrison's revenue to fifteen percent of CRS's proceeds, no matter the source, or, as Harrison claims, to make clear that CRS does not owe royalties on sales for which it did not actually receive payment.

6

The parties also disagree on the meaning of the phrase in parentheses "(or PUBLISHER'S licensee or agent engaged for the purpose of sale, distribution or manufacture of the Work)." Without this parenthetical phrase, the passage would read "A royalty of fifteen percent (15%) of the net proceeds actually received by the PUBLISHER in respect of (i) all sales by PUBLISHER . . . ." If this were the language of the contract, Harrison's interpretation would, again, prevail. Harrison argues that the parenthetical language is merely a description of a publisher's duties and that he is entitled to fifteen percent of the net proceeds of whoever publishes *Houses*. CRS argues that the parenthetical phrase makes clear that Harrison is to receive either fifteen percent of either CRS's net proceeds from sales or CRS's net proceeds from its agent or licensee. Neither of these interpretations is completely persuasive construing the phrase alone: Harrison interprets "PUBLISHER," a term defined in the contract to mean RNMI[2], to mean any publisher who might publish *Houses* as an agent for CRS. The construction advanced by CRS puts great weight on this short parenthetical phrase. Under CRS's construction, the addition of this parenthetical phrase reduces the amount to which Harrison is entitled from fifteen percent to roughly one or two percent of the net proceeds received by CRS's agent or licensee. Thus, neither party's interpretation of the parenthetical language is completely convincing.

For the reasons stated above, it cannot be said that the plain language of the contract unambiguously sets forth the intent of the parties. Therefore, the Court finds that the language of paragraph 9(b) of the 1991 Agreement is ambiguous.

---

[2]PUBLISHER would now be defined as CRS since CRS is RNMI's successor in interest with respect to the 1991 Agreement.

7

"[O]rdinarily, where contract language is ambiguous, and therefore must be decided on the basis of extrinsic evidence, summary judgment is inappropriate." *William Blair and Co., LLC v. FI Liquidation Corp.*, 358 Ill.App.3d 324,342 (1st Dist. 2005). Here, there are significant factual disputes regarding key extrinsic evidence. Harrison asserts that during the negotiation of the 1991 Agreement, he made clear that he expected to receive a straight fifteen-percent royalty of the net proceeds received by whoever published the book. Harrison asserts that his rejection of proposals by RNMI that offered less than that amount show his intent that he receive that straight fifteen-percent royalty. CRS disputes Harrison's account of the negotiations. Additionally, the parties dispute the degree of Harrison's knowledge of the negotiation of the 1991 Dearborn Agreement and the extent to which that agreement would affect the royalties received by Harrison.

Therefore, considering these factual disputes between the parties, the matter is not appropriate for summary judgment. Therefore, both motions for summary judgment are denied with respect to the issue of construction of the 1991 Agreement.

CRS has also moved for summary judgment on its assertion that the provision of the 1991 Agreement that awards Harrison five-percent monthly interest on payments due is an unenforceable penalty provision. Paragraph 9(f) of the 1991 Agreement provides in part:

> "If balance due is not paid within the two month period described above, PUBLISHER will pay AUTHOR five percent (5%) monthly interest on balance until it is paid in full."

For a liquidated damages clause to be valid under Illinois law, the following three elements must be met:

> (1) the parties intended to agree in advance to the settlement of damages that might arise from the breach;

(2) the amount of liquidated damages was reasonable at the time of contracting, bearing some relation to the damages which might be sustained; and

(3) actual damages would be uncertain in amount and difficult to prove.

*Jameson Realty Group v. Kostiner*, 351 Ill. App.3d 416, 424 (1st Dist. 2004). CRS asserts that the second and third elements of this test are not met.

Brief consideration of Paragraph 9(f) reveals it to be an unenforceable penalty provision. Harrison has not shown that a five-percent interest rate is in any way related to the damages he would sustain in case of nonpayment. Harrison has not shown his damages from CRS's delay in paying royalties to be anything beyond the damage usually suffered due to late payments – damages that are typically addressed through the application of a reasonable interest rate rather than the five-percent monthly rate applied here. *See Hidden Grove Condominium Ass'n v. Crooks*, 318 Ill. App.3d 945, 947 (3d Dist. 2001) ("Typically, an interest charge to recover the lost value of money ranges between 5% and 10%. To demand an interest rate in gross excess of this amount is unnecessary and does not reasonably relate to any recoverable expense of a late payment."). Harrison has also not put forward a convincing argument as to why damages would be uncertain in amount or difficult to prove. Harrison argues that CRS has been unable or unwilling to provide Harrison with financial records concerning the amount of royalties owed to him, thereby making damages difficult to prove. However, the clause providing for five-percent monthly interest is excessive regardless of the actual amount due. Furthermore, Harrison admits that the provision was inserted to compel timely payments by CRS, as they had failed to make timely payments in the past.

## CONCLUSION

For the reasons stated above, Harrison's motion for summary judgment is denied. CRS's motion for summary judgment is denied in part and granted in part: summary judgment is granted in favor of CRS on their contention that Paragraph 9(f) of the 1991 Agreement is unenforceable as against public policy; CRS's motion for summary judgment is denied to the extend it seeks a ruling concerning the correct interpretation of the royalties due under the 1991 Agreement.

Dated: 4-14-09

JOHN W. DARRAH
United States District Court Judge